

Decided May 5, 1986

536

538

FILED

86 MAY 5 A 8: 31

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
COMMONWEALTH TRIAL COURT

| | |
|---|---|
| EMPLOYMENT CONSULTANTS, INC., d/b/a WESTERN PACIFIC BUSINESS COLLEGE, | ) ) ) CIVIL ACTION NO. 84-424 |
| Plaintiff, | ) ) 1. PARTIAL SUMMARY JUDGMENT; ) 2. ORDER OF DISMISSALS; AND |
| vs. | ) 3. ORDER RE:  SUBSTITUTION ) OF PARTY |
| ROBERT O'CONNOR, et al., | ) |
| Defendants. | ) ) |

THE FACTS

The plaintiff, Employment Consultants, Inc., dba Western Pacific Business College (hereafter WPBC) filed this civil rights suit pursuant to 42 U.S.C. § 1983.[1] The essential facts are not in dispute.

The plaintiff received a license to conduct business in the Commonwealth as a business school and at the critical times herein was conducting its business. At all times pertinent hereto, defendant Rexford C. Kosack was the Attorney General

---

[1] The matter has proceeded upon plaintiff's First Amended Complaint since October 11, 1985 when the court allowed plaintiff to amend.

for the Commonwealth Government and defendant Robert O'Connor was the Deputy Attorney General.

The plaintiff applied for a charter from the Northern Marianas Board of Regents pursuant to 3 CMC § 1171 because of the apparent belief that WPBC may be required to have such a charter. While the application for the charter was pending, the President of the College wrote a memorandum to the Attorney General on April 24, 1984 expressing concern about the propriety of WPBC operating its business in the Commonwealth without a charter.[2] Mr. O'Connor sent a copy of the memo along with a letter to WPBC on May 3, 1984 which stated that: "We would like a response to it (the memo) within ten (10) days."

On May 8, 1984 WPBC responded that an answer "is forthcoming." On May 30, 1984 Mr. O'Connor wrote a letter

---

[2] Many of the facts related herein are gleaned from various documents filed by the plaintiff. Counsel for the individual defendants Kosack and O'Connor objected to most of them because of the failure to certify as required by Com.R.Civ.P. 56(e). In light of the fact that the documents were government documents and the defendants had sufficient time to verify the documents as true copies and the defendants, themselves, referred to some of the documents, the court finds it is proper to consider them. Indeed, there is no dispute over the crucial documents which are the April 24, 1984 memo of the President of the College, the May 3, 1984 letter sent by Mr. O'Connor to WPBC and the May 30, 1984 letter sent by O'Connor to WPBC. The latter is the crux of plaintiff's action. As to the newspaper clippings submitted by plaintiff, these are not considered.

to WPBC ordering it to stop operating its business until it complied with unspecified Commonwealth laws.[3] Subsequent to this letter, it was determined that WPBC did not need a charter nor was it in violation of any law and about 30 days later the action taken in the May 30, 1984 letter was rescinded.

Plaintiff's civil rights action is based upon the allegations that defendants Kosack and O'Connor were acting under color of state law and the defendants deprived WPBC by depriving it of rights secured by the United States Constitution. The deprivation stems from the failure of the defendants to give WPBC adequate notice and an opportunity to be heard pursuant to the due process provisions of the United States and Commonwealth Constitutions.

## THE MOTIONS

Various motions have been filed by all parties. They will be set forth in the order of filing and the thrust of each

---

[3]
The letter reads:
"This office wrote you a letter on May 3, 1984, asking you to respond to some serious concerns of the President of the Northern Marianas College. It appears that you have neglected to respond to our inquiry.

We must conclude that you admit that the concerns expressed in that letter are valid. Accordingly, you are ordered to cease operations forthwith and, by copy of this letter, all agencies of the CNMI government are instructed to end any relationship they may have with your Business College until it complies with our laws."

541

motion stated succinctly. The discussion of each motion will follow in the same order.

Plaintiff began the motion parade by filing a motion for partial summary judgment. The motion asks the court to render judgment against all defendants on the issue of liability because of the May 30, 1984 letter written by O'Connor.

Next, the defendants Kosack and O'Connor, who are sued individually and in their official capacities, filed motions to dismiss and for summary judgment.

On behalf of Kosack, it is argued that there are no allegations or facts to show personal involvement on his part.

For both defendants, it is asserted that they enjoy absolute immunity from suit and, if not that, qualified immunity. It is also argued that WPBC had adequate due process notice of the action taken against it and that the post deprivation remedies available to it were also adequate.

Lastly, the Commonwealth Government filed a motion to dismiss and summary judgment. Two grounds are advanced. First, complete sovereign immunity is asserted. Second, it is claimed that plaintiff is a dissolved corporation and as such has no further ability to prosecute its action.

DISCUSSION

A.   THE DEPRIVATION OF DUE PROCESS

To state a claim for relief under section 1983, the plaintiff must allege (1) that the defendants acted "under

542

color of state law" and (2) that the defendants deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or the laws of the United States. Parratt v Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981).

There is no perceived dispute that Mr. O'Connor was not acting under color of the Commonwealth law at the time he wrote the May 30, 1984 letter and there is no need to tarry on this point.

The right which the plaintiff claims to be deprived of was its right to a due process hearing before Mr. O'Connor told WPBC to stop its operations and instructed all government agencies to end its "relationship" with WPBC.

That this action was precipitous, wrong and illegal is clear. There is no dispute that WPBC had done everything it needed to do to operate its business. It had formed a corporation pursuant to the laws of the Commonwealth and received a corporate charter in August of 1983.

It applied for and received a business license from the Director of Commerce & Labor and was duly licensed to do business at the time of the events complained of here. The defendants cite no authority, nor can the court find any, which would authorize either the ten day response request in the May 3, 1984 letter sent by Mr. O'Conner or the action taken in the May 30, 1984 letter. A reading of the May 30, 1984 letter

clearly leads to the conclusion that the intent and purpose of the letter was to revoke the license and WPBC's privilege of doing business.[4]

The only real response defendants make to the due process deprivation issue is that the May 3, 1984 letter provided notice and afforded WPBC the opportunity to present evidence to rebut the charges.

Even if one were to ignore the fact that the Attorney General had no authority to order WPBC to respond in 10 days, the May 3, 1984 letter does not inform WPBC that if it didn't respond its license to do business would be revoked. Notice to comport with due process requirements, must apprise the party being notified of the pendency of an action against the party and to allow the party to prepare for the hearing and afford the opportunity to present objections to the specified pending action.

Mullane  v  Central  Hanover Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)

---

[4]/ The procedure for the suspension or revocation of a business license is set forth in 4 CMC § 1503(f). This provision provides, inter alia, that the Director of Commerce & Labor (not the Attorney General) may revoke or suspend a business license after two weeks public notice and a hearing held pursuant to 1 CMC § 9108-9111 (The Administrative Procedure Act) and a finding that the licensee did certain acts or (more applicable here) "violated any provisions of Commonwealth laws or any rule or regulation issued thereunder." (4 CMC § 1503(f)(1)(D).

Memphis Light, Gas & Water Div. v Craft,

436 U.S. 1, 98 S.Ct. 1564, 56 L.Ed.2d 30 (1978).

The May 3, 1984 letter clearly fails to satisfy these requirements.

It is concluded that plaintiff has not only alleged the necessary allegations for a § 1983 claim but it has also shown the elements to impose liability on the defendants unless they escape such liability on a legally acceptable basis.[5]

B. IS DEFENDANT KOSACK LIABLE?

The First Amended Complaint, in so far as defendant Kosack is concerned, only alleges that at the time of the May, 1984 letters, he was the Attorney General. There are no allegations of personal involvement with the May 3, 1984 or May 30, 1984 letters. To allege a § 1983 cause of action against Mr. Kosack either individually or in his official capacity, more is needed. On an individual basis, there is simply nothing in the First Amended Complaint to connect or involve Kosack with the actions and letters of Mr. O'Connor.

---

[5] At argument, the court, sua sponte, raised the issue as to whether the plaintiff had sufficient allegations for damages to support its § 1983 cause of action. The First Amended Complaint alleges the plaintiff incurred and suffered damages to its reputation and that defendants' actions harmed plaintiff's business. Loss of reputation alone is neither liberty nor property for Constitutional purposes and is not actionable under 42 U.S.C. § 1983. Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 504 (1979). However, to the extent the unconstitutional conduct causes injury to the plaintiff's business reputation, the injury is compensable as an element of damages flowing from the unlawful conduct. Marrero v City of Hialeah, 625 F.2d 499 (5th Cir.) The plaintiff appears to have satisfied this criteria.

545

On an official capacity basis, there is no such liability in 1983 cases based on the doctrine of respondeat superior. Monell v Department of Social Services, 436 U.S. 658, 98 S.ct. 2018, 56 L.Ed.2d 611 (1978); May v Enomoto, 633 F.2d 164 (9th Cir. 1980)

That is exactly the theory upon which plaintiff's First Amended Complaint attempts to reach defendant Kosack.[6]

Neither the First Amended Complaint, nor any of the documents, depositions or affidavits considered for these motions support any possible basis for liability on the part of defendant Kosack and this action as to him will be dismissed.

C.  DOES DEFENDANT O'CONNOR HAVE ABSOLUTE IMMUNITY?

As seen above, there are sufficient facts to find defendant O'Connor liable for the deprivation of due process unless he is otherwise immune from suit.

---

6/
Kosack has filed an affidavit stating the complete absence of any involvement, knowledge or instruction to O'Connor for the May 3 and May 30, 1984 letters. The plaintiff points to a May 29, 1984 memo written by Kosack to the Board of Regents which gave legal advice on the WPBC matter. This, of course, does not implicate Kosack in any way with the actions of O'Connor and, as pointed out already, the plaintiff has not even pled that Kosack even knew of O'Connor's actions in respect to the May 30, 1984 letter. Plaintiff also attempts to gather Kosack in the liability net by referring to a portion of Kosack's deposition where he refers to O'Connor, his deputy, as his alter ego. This, of course, is nothing more than an attempt to apply the respondeat superior doctrine.

O'Connor asserts both absolute immunity under the authority of Imbler v Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) and qualified immunity as spelled out in Harlow v Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) and Davis v Scherer, ___ U.S.___ 104 S.Ct. 3012 (1984).

Imbler involved a prosecutor in a criminal matter who allegedly introduced perjured testimony at trial at the time he knew it was false. The Supreme Court held the prosecutor was absolute immune from suit since the asserted acts were within the scope of the prosecutor's duties of initiating and prosecuting the State's case.

O'Connor argues that though his actions did not involve the prosecution of a criminal case the rational of Imbler should apply to him since he was only carrying out his duties of rendering legal advice pursuant to Article II, Section 11 of the Constitution of the Commonwealth[7] and 1 CMC § 2153(h).[8]

Butz v Economou, 438 U.S. 508, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) and Demery v Kupperman, 735 F.2d 1139 (9th Cir. 1984) cert den 105 S.Ct. 810 are cited for the proposition

---

[7] The provision reads: "The Attorney General shall be responsible for providing legal advise to the ... Governor and executive departments, representing the Commonwealth in all legal matters, and prosecuting violations of Commonwealth law."

[8] This provision provides that the Attorney General has the duty to act as counsel for all departments and agencies in the Commonwealth Government.

547

that the absolute immunity afforded by _Imbler_ is applicable to officials who initiate administrative proceedings.

_Butz_ sets forth three factors to be examined to determine if immunity is to be afforded the official:

  1. the historical or common law basis for immunity;

  2. whether the functions that the official performs subject him to the risks of vexatious litigations characteristic of the judicial process; and

  3. whether the official is subject to checks within the system upon abuses of authority, such as correction of error on appeals.

This requires an analysis of the acts of Mr. O'Connor in respect to his May 30, 1984 letter.

It is clear that the letter is not legal advice. It is not an opinion and it is not in response to a government agency for advise.[9] Nor is the May 30, 1984 letter one to enforce the law.[10]

---

[9]
_Demery_, supra is clearly distinguishable. The Deputy Attorney General issued a verbal opinion in an administrative proceeding to revoke a physician's license. The act of the official was (1) clearly legal advice; (2) advice to the administrative agency; and (3) was in an administrative proceeding. None of these factors are present in this case.

[10]
Defendant O'Connor also relies on _Goldschmidt v Patchett_, 686 F.2d 582 (7th Cir. 1982). There the government attorrey wrote a letter to another attorney advising him that his newspaper advertisement was prohibited by statute. The court granted absolute immunity because the government attorney was exercising a quasi-judicial function. As seen above, there is no pretense by O'Connor that he was enforcing a law when he wrote the May 30, 1984 letter. The law for revocation of a business license is found in 4 CMC § 1503(f).

The letter leaves no doubt in the minds of any reader (and certainly the corporate officers of WPBC) that Mr. O'Connor was the final decision maker for the Government.[11] In short, the May 30, 1984 letter renders the ultimate decision to revoke WPBC's business license and right to do business.[12]

In this context, when the <u>Butz</u> factors are examined, it is concluded that no absolute immunity shields Mr. O'Connor. The act complained of here is not one which would subject O'Connor to the risks of vexatious litigation characteristic of the judicial process nor is Mr. O'Connor subject to checks within the system such as correction on appeal.

One analogy will suffice to point out the defects in defendant's arguments. If, after failing to receive any answer from WPBC, Mr. O'Connor initiated administrative proceedings pursuant to 4 CMC § 1503(f) and the Administrative Procedure Act to revoke WPBC's license and during those proceedings he used false testimony, forged documents, or failed to give

---

[11] Significance is given to the distinction between just giving legal advice and acting as a final decision maker. A Government attorney who renders legal advice probably in most cases will enjoy immunity. However, as a decision maker, his or her immunity may vanish.
<u>Pembauer v City of Cincinatti</u>, ___U.S.___, 106 S.Ct. 1292 at 1301 (1986).

[12] Defendants also cite <u>Mother Goose Nursery School v Sendall</u>, 770 F.2d 668 (7th Cir. 1985) cert den ___U.S.___ (1986) for the application of absolute immunity. In <u>Mother Goose</u>, the attorney was involved in the approval of government contracts for form and legal sufficiencies. How that case assists in the resolution of this matter escapes the court.

proper notice, the analysis and application of <u>Butz</u> would come into play. The distinction between the cases cited by defendant and the case at hand is obvious. Absolute immunity is not available to Mr. O'Connor under the circumstances of this case.

D. DOES DEFENDANT O'CONNOR HAVE QUALIFIED IMMUNITY?

The current test for qualified immunity is set forth in <u>Davis v Scherer</u>, __U.S.__ 103 S.Ct. 3012 (1984). If the official knew or reasonably should have known that his conduct violated plaintiff's federally protected rights, he is not accorded immunity. In <u>Harlow v Fitzgerald</u>, supra, the Supreme Court used the objective test of whether a reasonable official would have known that he or she were violating established Constitutional rights. If the law is unclear, the defendant should be entitled to immunity.

Both plaintiff and defendant assert that whether Mr. O'Connor's official conduct comports with the <u>Harlow</u> or <u>Davis</u> standard, is a question of law that may be resolved on a motion for summary judgment. It is not certain if such would be the conclusion in all cases. What is determined today is that this matter is amenable to summary judgment treatment and it is concluded under either <u>Harlow</u> or <u>Davis</u> there is no qualified immunity to shield the defendant O'Connor.

Mr. O'Connor was the second highest legal officer in the Attorney General's Office. It is concluded that he either knew or should have known that the precipitous revocation of WPBC's

right to do business denied the latter its right to due process. This is not a matter where the law is unclear or uncertain. The authority for the issuance, retention, revocation, and suspension of business licenses is set forth in the Commonwealth Code. The administrative procedure for action by the Director of Commerce & Labor is set forth in detail in the Administrative Procedure Act.

As observed above, this is not a matter of an attorney giving legal advice or prosecuting an administrative proceeding. There is no qualified immunity for defendant O'Connor.

The plaintiff has sued Mr. O'Connor individually and in his official capacity as Deputy Attorney General.[13]

Personal-capacity suits seek to impose liability upon a government official for actions he takes under color of state law. See, e.g., Scheuer v Rhodes, 416 U.S. 232, 237-238, 94 S.Ct. 1683, 1686-1687, 40 L.Ed.2d 90 (1974).

To establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state

_____
[13] Although paragraph 4 of the First Amended Complaint states that the action is for injunctive relief to prevent the further deprivation of plaintiff's civil rights, in actuality, the action is strictly for monetary damages as evidenced by the prayer. Additionally, over a year before the suit was filed, any action or order encompassed in the May 30, 1984 letter had been rescinded making any alleged claim for injunctive relief of no substance. Thus the cases which allow injunctive relief against state officials as opposed to monetary damages are not applicable. Cf. Pulliam v Allen, 466 U.S. _____, 104 S.Ct. 1970, _____ 80 L.Ed.2d 565 (1984) (state judge liable for injunctive and declaratory relief under § 1983).

law, caused the deprivation of a federal right. See, e.g., Monroe v Rapé, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

Official-capacity suits, on the other hand, are, in all respects other than name, to be treated as a suit against the governmental entity by whom the official is employed.

Brandon v Holt, 469 U.S. _____, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985).

If there is an award of damages against the official in his personal capacity, only his or her personal assets are available for recovery by the plaintiff. If the judgment is in an official-capacity, the plaintiff must look to the government entity itself.

It is in the personal-capacity action that the official may assert personal immunity defenses such as absolute or qualified immunity. However, in official-capacity actions, the only immunity available is sovereign immunity. Kentucky v Graham, _____U.S.___, 105 S.Ct. 3099 (1985).

Thus, if the sovereign is immune, there is no official-capacity recovery possible and plaintiff can only look to the official in his individual capacity and only his assets are subject to satisfying any judgment. As will be seen, such is the case here.

E.    DOES AN ADEQUATE POST-DEPRIVATION REMEDY EXIST TO DEFEAT PLAINTIFF'S SECTION 1983 ACTION?

Parratt v Taylor supra, and Hudson v Palmer, __U.S.__ 104 S.Ct. 3194 (1984) held that neither negligent nor intentional

552

random acts which deprive one of property are actionable under 42 U.S.C. § 1983. However, there must exist adequate post-deprivation remedies available to the plaintiff.

The thrust of defendant's argument here is that the plaintiff has a cause of action for the breaches of contracts held with the CNMI Government pursuant to 7 CMC § 2251.

This, of course, is true but this does not go to remedy the loss of business reputation and resulting damages to all other existing contracts or any potential ones lost by the plaintiff because of the May 30, 1984 letter. Simply put, there is no adequate post deprivation remedy for this asserted injury.[14]

---

14/
The defendant also argues that a post-deprivation remedy exists in that the plaintiff could appeal under the Administrative Procedure Act. The court is unable to discern how the plaintiff could appeal from a non-existent order. Certainly the May 30, 1984 letter was not, by any stretch of the imagination, the result of an administrative hearing nor was the letter an order issued by the government agency charged with the enforcement of the business license provisions of the law.

Another argument made by defendant to plaintiff's suit is that the pre-deprivation procedure did comport with the due process provision and since the Board of Regents and Mr. O'Connor rescinded the action encompassed in the May 30, 1984 letter, 'everything is now OK.' This certainly may effect the extent of damages but it does not mean the defendant is not liable for any damages resulting from the May 30,1984 letter. By ordering WPBC to cease doing business and suspending the contracts it had with government agencies, the damage was done and it couldn't be undone by the rescinded order 30 days later.

Similarly, the court rejects defendant's arguments that the plaintiff invited O'Connor's letter and that WPBC started the chain of events by applying for a charter. Neither argument responds to the crucial fact that defendant O'Connor had no authority whatsoever to do what he did.

553

F.    DOES  THE  GOVERNMENT  OF  THE  COMMONWEALTH OF THE
      NORTHERN MARIANA ISLANDS HAVE SOVEREIGN IMMUNITY IN  A
      42 U.S.C. § 1983 SUIT?

Although  §  1983  imposes liability on 'Every person' who
violates its provisions, Monell  v  Department  of  Social
Services,  436  U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978),
held that for the purposes of § 1983  actions,  municipalities
are  'persons'  and  under certain circumstances are liable in
such actions.

However, in so far as a state of  the  United. States  is
concerned,  the  Supreme  Court has consistently rejected the
notion of liability for monetary damages of a State premised  on
42 U.S.C.  § 1983 unless the State has unequivocally waived its
immunity and consented to the suit.

Quern v Jordan, 440 U.S. 332, 99 S.Ct. 1139, 39 L.Ed.2d  358
(1979);

Alabama  v  Pugh,  438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d
1114 (1978);

Hutto v Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d  522
(1978);

Milliken  v Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d
745 (1977);

Fitzpatrick v Bitzer, 427 U.S. 445,  96  S.Ct.  2666,  49
L.Ed.2d 614, (1976)

Scheuer  v  Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d
90 (1974);

Edelman v Jordan, 415 U.S. 651, 94 S.Ct. 1347,  39  L.Ed.2d
662 (1974).

Succinctly put, the Supreme Court is "unwilling to believe ... that Congress intended by the general language of § 1983 to override the traditional sovereign immunity of the States."

Quern v Jordan, supra, at pg. 1145.

The above cases generally rely on the Eleventh Amendment of the U.S. Constitution which provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Yet, it is clear that the significance of the Eleventh Amendment "lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Article III of the Constitution."

Atascadero State Hosp. v Scanlon, ___U.S.___ 105 S.Ct. 3142 (1985) at pg. 3145, citing Pennhurst State School & Hospital v Halderman, 465 U.S. 89, ___104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984).

Therefore, although the cases speak of, or refer to, the Eleventh Amendment, there co-exists the traditional sovereign immunity which supports an independent basis for excluding states from § 1983 liability.

But what about the territories and other sovereign entities affiliated with the United States? To this date, every published case on the matter cited to the court has held that a territory is accorded sovereign immunity unless the territory consents to the suit.

555

Muna v. Government of Guam, 625 F.2d 257 (9th Cir., 1980);

Ursulich  v  Puerto  Rico National Guard, 384 F.Supp. 736

(D.C.D.P.R., 1974);

Harris v. Municipality of St. Thomas  &  St.  John,  111

F.Supp. 63, aff'd 212 F.2d 323 (D.C. V.I., 1953);

Compagnie  Generale Transatlantique v Governor of the Panama

Canal, 90 F.2d 225 (9th Cir. 1937)

"It is an established principle of law in our system,
which rests on grounds of public policy, that the
sovereign cannot be sued in its own courts or any other
court without its consent and permission.  It is
inherent in the nature of sovereignty not to be
amenable to a suit by an individual without its
consent.  This principle applies with full force
to the several states of the Union.

That the principle is, likewise, applicable to the
Commonwealth of Puerto Rico is clear, for the
Commonwealth possesses many of the attributes of
sovereignty, and has full power of local self-
determination similar to the one the states of the
Union have.  Immunity from suit without its
consent is one of those attributes.  Such was
the state of the law even prior to the creation
of the Commonwealth of Puerto Rico.
                    Ursulich, supra.

The Commonwealth of the Northern Mariana Islands  possesses
as  many  (and probably in some instances, more) attributes of
sovereignty than the other territories or the  Commonwealth  of
Puerto Rico.

The  source of this sovereignty is found in the Covenant to
Establish a Comonwealth of the  Northern  Mariana  Island  in
Political  Union  with the United States of America (Covenant),
which provides for  self-government  with  respect  to  the
Commonwealth's  internal  affairs,  leaving matters of foreign
affairs and  defense  to  the  United  States.   Article I,

Covenant. Section 105 of Article I, further restricts the United States in enacting legislation which affects the Commonwealth.

The Commonwealth is currently exempt from certain laws which are applicable to the states of the United States. Notably, the Commonwealth administers its own immigration and naturalization laws. Section 503, Article V, Covenant. In certain ways, the Commonwealth is treated as an outside political entity. It is not within the customs territory of the United States. § 603, Covenant.

The effect and result of the Covenant is to establish a 'unique' political status for the Commonwealth which accords to the Commonwealth attributes of sovereignty which no other State or Territory possesses. Commonwealth of the Northern Mariana Islands v Atalig, 723 F.2d 682 (9th Cir., 1984).[15]

It is pointed out that the Covenant does not apply the provisions of the Eleventh Amendment of the United States Constitution to the Commonwealth. This is of no import. The Commonwealth possesses the attributes of sovereign immunity because of the terms of the Covenant. If the Eleventh

_____

[15] The Section by Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands (Analysis) appropriately notes that the Commonwealth of the Northern Mariana Islands is guaranteed local self-government which has not been made by the United States to territories such as Guam and the Virgin Islands. It is further stated: "The Northern Mariana Islands Government will be an independent government, like that of the states. For the same reasons, the Government of the Northern Mariana Islands will have sovereign immunity, so that it cannot be sued on the basis of its own laws without its consent." Analysis, pp. 10 and 11.

Amendment had been included in the Covenant, one might question the purpose of it because it, of course, refers and relates to states and the federal judicial power. The Commonwealth is not a state.

Nor is the Commonwealth to be equated with a municipality or local government. The distinction between a city or a county of a state and the Commonwealth need not be elaborated on. Succinctly put, the former are formed under the authority of a state by incorporation or charter. They are a sub-political entities of the State.

The Covenant expresses the intent of the people of the Commonwealth and the United States Congress as to the relationship between the Commonwealth and the United States. The people of the Commonwealth intended to form a sovereign Commonwealth with all of the attributes pertaining thereto. But what about the U.S. Congress? To abrogate the constitutionally secured immunity of the states of the United States from suit in federal court, the Congress must make its intention unmistakably clear in the language of the statute which would affect the sovereign immunity. Atascadero State Hosp. v Scanlon, supra, at 105 S.Ct. 3147, 3148.

It appears certain to this court that the same requirement applies to the Covenant which is a solemm pact between two sovereigns. Should not the people of the Commonwealth expect similar protection against the abrogation of the Commonwealth sovereign immunity? The Covenant was not executed and approved until after extensive negotiations. The opportunity for the

United States to expressly subject the Commonwealth to § 1983 suits and to, in effect, disturb the balance between the sovereigns in this respect, was available. The Covenant contains no unmistakable expression of the U.S. Congress that the Commonwealth is subject to suit for § 1983 actions.

With this backdrop, plaintiff argues that notwithstanding the sovereign status of the Commonwealth, it has consented to be sued.[16]

7 CMC §§ 2201-2254 set forth the extent of the waiver of liability of the Commonwealth Government. The "Government Liability Act of 1983" repealed the former provisions found in Title 6 of the Trust Territory Code, §§ 251(1)(c), 252 and 253.[17] Section 253 was based on a United States statute (28 U.S.C. § 2674) which essentially states that actions may be brought against the government and in the same manner and to the same extent as a private individual under like circumstances for tort claims. The repeal of this section and

---

16/
This argument was raised at oral argument. The written opposition to the Government's motion cites the case of Fleming v Dept. of Public Safety & Commonwealth of the Northern Mariana Islands. This case is an unpublished decision of the District Court of the Northern Mariana Islands and is presently on appeal to the Ninth Circuit Court of Appeals. The District Court essentially found a state is a 'person' liable under 1983 for monetary damages but need not be brought to answer in Federal Court absent a valid waiver of its Eleventh Amendment immunity. Since, it is reasoned, the Eleventh Amendment was not made applicable to the Commonwealth in the Covenant (See § 501) there is no immunity.
17/
The Government Liability Act became effective March 29, 1983 and was in effect at the times of the events complained of by plaintiff.

the specification of the waivers for suit found in the present law shows a definite trend by the Commonwealth Legislature to decrease the extent of suits possible against the Commonwealth. A reading of §§ 2202, 2251 and 2254 leads the court to the conclusion that there has been no waiver for this § 1983 suit. The only category that is possibly applicable is the tort liability waiver provisions in § 2202. However, plaintiff's claim is not based or founded on the negligent act of Mr. O'Connor but the specific civil rights statute found in 42 U.S.C. § 1983.

The importance of the attribute of sovereign immunity comes into sharp focus at this juncture. The principle assures that the sovereign may operate a government without unanticipated intervention (in the form of defending lawsuits not agreed to and a levying on the public treasury) and with "unfettered freedom for government from crippling interferences."

> Great No. Life Ins. Co. v Read, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1984).

The Commonwealth Legislature has not only specified the types of suit it consents to but has also set monetary limits on recovery against the Government.[18]

---

[18/]
For a tort claim against the Government, the limit is $100,000 and for a wrongful death claim, $50,000. 7 CMC § 2202(a). This limitations were inserted because of the specific legislative intent to limit the exposure of the government to tort claims. See, legislative history, Public Law 3-51.

This is a sovereign attribute which the Commonwealth Legislature has utilized for its purposes. The reasons for the exercise of that right become abundantly clear when the nature of the Commonwealth Government is examined in so far as resources, income, population, infrastructure and the like are considered.[19]

It is concluded that the unique political status of the Commonwealth affords it sovereignty no less than any State or Territory of the United States and there simply is no consent to be sued for the claims alleged by plaintiff under 42 U.S.C. § 1983.

G. DOES PLAINTIFF HAVE STANDING TO SUE?

One last issue must be addressed. Though raised by the Government (who will be dismissed as a defendant) it still effects the prosecution of the remaining claims.

It is asserted that the plaintiff, as a corporation, no longer exists since it was dissolved last year. The plaintiff disputes the procedures used to dissolve it but to this date nothing (to the court's knowledge) has been done to correct any defect in the dissolution procedure or to re-establish the corporation.

---

[19]/
For example the 1986 fiscal year budget (P.L. 5-9) shows internal revenue to be slightly in excess of $40,000,000. Plaintiff's claim is $700,000 plus attorney fees and costs. Conceivably, this one civil rights case, if consented to, could take up to 1/40th of the internal revenue of the Commonwealth.

561

At this juncture, the court must presume that the proper administrative and governmental procedures have been performed. The affidavit of the Registrar of Corporations for the Commonwealth is not rebutted. No corporation in the name of Employment Consultants, Inc. currently exists.

However, section 6.3 of the Administrative Rules for Corporations provides that after involuntary dissolution, the directors of the corporation shall act as trustees for creditors and stockholders of the corporation to settle its affairs. Thus, it appears that a substitution of the real parties in interest is the solution pursuant to Civil Procedure Rules 17(a) and 25(c). It will be ordered that the plaintiff either cause its corporate existence to be reinstated or to certify under oath the directors of the corporation who are qualified to continue to prosecute and defend th claims reflected in this action. Due to the short time before trial, this must be done in seven days.

### CONCLUSION

1. Summary judgment is hereby entered in favor of Rexford Kosack and he is dismissed from the lawsuit.

2. Summary judgment is hereby entered in favor of the plaintiff and against Robert O'Connor in his personal capacity on the issue of liability. Damages will be determined at trial.

3. Summary judgment is entered in favor of the Commonwealth Government and it is dismissed from this lawsuit as a defendant.

562

4. Plaintiff has seven days from this date to either re-establish its corporate existence or to substitute its qualified directors for further proceedings.

Dated at Saipan, CM, this _5_ day of _May_, 1986.

_____
Robert A. Hefner, Chief Judge